UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------X
Philip M. Bray, Ingrid V Noreiko-Bray,
individually and as trustee for Norday          CV-08-2247
Charitable Remainder Unitrust, and Label
Service, Inc.,

                         Plaintiffs,             MEMORANDUM
                                                 OPINION AND ORDER

         - against -

The Leverage Group, Leverage Option
Management Co., Inc., North American
Financial, Philip Barry LLC, and Philip
Barry,

                         Defendants.
----------------------------------------X
Miriam Greenberger

                                                 CV-08-4123(CPS)(SMG)
                         Plaintiff,


         - against -


The Leverage Group, Leverage Option
Management Co., Inc., North American
Financial, Philip Barry LLC, and Philip
Barry,

                         Defendants.
----------------------------------------X
SIFTON, Senior Judge.

    The following two actions are considered together for the

purposes of this motion.

    Plaintiffs Philip M. Bray, Ingrid V. Noreiko-Bray,

individually and as trustee for Noray Charitable Remainder

Unitrust, and Label Service Inc. (collectively, "plaintiffs"),

commenced an action against defendants the Leverage Group

("Leverage Group"), Leverage Option Management Co., Inc.

("Leverage Option Management"), North American Financial ("North

American"), Philip Barry, LLC ("Barry, LLC") and Philip Barry

("Barry") (collectively, "defendants"), alleging that defendants

are in breach of their investment contract, have breached their
duty of good faith and fair dealing, have enjoyed unjust
enrichment, and have committed fraud. Plaintiffs seek actual
damages believed to exceed $75,000, punitive damages, costs and
attorneys fees, and post-judgment interest accruing at the legal
rate. Presently before this Court is the plaintiffs' motion to
attach certain assets belonging to the defendants. Defendants
have not opposed this motion.

Plaintiff Miriam Greenberger ("plaintiff") commenced an
action against the above-named defendants, alleging (1)
securities fraud; (2) breach of contract; (3) breach of implied
covenant of good faith and fair dealing; (4) breach of fiduciary
duty; (5) unjust enrichment; (6) fraud; (7) conversion; and (8)
negligent misrepresentation. Plaintiff seeks compensatory
damages, punitive damages, pre-judgment interest, and attorneys
fees.

For the reasons set forth in my prior ruling in *Monteleone
et al. v. Leverage Group et al.,* 2008 U.S. Dist. LEXIS 78983
(E.D.N.Y. October 7, 2008), and the additional findings of fact
and conclusions of law set forth below, the motion is granted.

### Background

Familiarity with the defendant parties and procedural
history is assumed. The following facts are drawn from
plaintiffs' complaints. Defendants do not dispute any of the

facts alleged plaintiffs.

*Bray Complaint*

Plaintiffs Philip M. Bray ("Mr. Bray") and Ingrid V. Voreiko-Bray ("Mrs. Bray") are citizens and residents of Mecklenburg County, North Carolina. Plaintiff Label Service, Inc. ("LSI") is a corporation organized and existing under the laws of North Carolina with its principal place of business in Mecklenburg Co., North Carolina. Mr. and Mrs. Bray are the principal owners, directors, and managers of LSI, a corporation that manufactures labels for clothing and other items. Noray Charitable Remainder Trust (the "trust") is a charitable remainder trust created under the laws of the state of North Carolina. Mrs. Bray is the current trustee for the trust, and brings this action both individually and in her capacity as trustee.

In May of 2005, Mr. and Mrs. Bray were vacationing in New York City when they met Barry in the bar of the Peninsula Hotel. Complaint at ¶ 13 ("Compl.") In the course of friendly conversation, Barry told them that he was an options broker running a very stable investment fund under the name The Leverage Group ("Leverage"). *Id*. Over the course of the next two years, Mr. Bray and Barry remained in contact, corresponding occasionally via email and telephone. *Id*. at ¶ 15. During the course of these conversations, Mr. Bray inquired about various

aspects of Leverage's operations and business. *Id*. at ¶ 16. On
May 19, 2005, Barry sent Mr. Bray an email stating that
Leverage's minimum effective annual yield to investors for
calendar year 2005 would be 12.55%. *Id*. at ¶ 17. Later that same
day, Mr. Bray sent an email to Barry noting that he had been
unable to find information regarding Leverage and asking for
reassurance that Leverage was a legitimate business enterprise.
*Id*. at ¶ 18. Barry, via telephone, told Mr. Bray that Leverage
was a private fund that did not have to be scrutinized like
public offerings or comply with reporting requirements. *Id*. On
May 31, 2005, Mr. Bray sent Barry an email asking about
Leverage's liquidity. *Id*. at ¶ 19. Via telephone, Barry told Mr.
Bray that any funds invested in Leverage could be withdrawn at
any time with a two or three week advance notification so that
options contracts could mature. *Id*. On February 2, 2007, Mr. Bray
emailed Barry about the tax implications of investing in
Leverage. In response, Barry told Mr. Bray, via email, that the
earnings from Leverage constituted short term capital gains, and
as such the tax would be deferred until the year of liquidation.
*Id*. at ¶ 21.

On April 29, 2007, Mr. and Mrs. Bray invested $100,000 in
Leverage via a check for $100,000 written from the Bray's joint
account, which they conveyed to Barry at a meeting in New York.
*Id*. at ¶ 22. The Brays were assigned a Leverage account numbered

4-292-07. Simultaneously, Mr. and Mrs. Bray invested an
additional $100,000 in Leverage on behalf of the trust via a
check written from the trust's account. *Id*. Thee funds were
assigned a Leverage account numbered 4-291-07. *Id*. On August 31,
2007, Mr. and Mrs. Bray invested an additional $100,000 with
Leverage via wire transfer. *Id*. at ¶ 24. In return, the Brays
received a "Deposit Ticket" from defendants showing receipt of
the funds and adding the funds to exiting account 4-292-07. *Id*.
In mid-September, 2007, Mr. and Mrs. Bray met with Barry in New
York in order to confirm the viability of Leverage and the safety
of their investments. *Id*. at ¶ 25. On September 21, 2007, LSI
invested $100,000 from its profit-sharing plan in Leverage. *Id*.
at ¶ 26. In return, LSI received an agreement signed by Barry
noting receipt of the funds into a new account numbered 9-211-07
and guaranteeing a minimum effective annual yield of 12.55%
through the end of calendar year 2007. *Id*. On November 10,2007,
Mrs. Bray invested $100,000 of her personal funds in Leverage.
*Id*. at ¶ 27. In return, Mrs. Bray received an agreement signed by
Barry noting receipt of the money into an account in Mrs. Bray's
name numbered 11-101-07 and guaranteeing a minimum effective
annual yield of 12.55% through the end of calendar year 2008. *Id*.
By letter dated December, 2007, defendants informed plaintiffs
that the guaranteed minimum effective annual yield for the
calendar year 2008 would again be 12.55%. *Id*. at ¶ 28. This

letter stated that 2008 would begin Leverage's 30th year in existence. Id.

On January 14, 2007, Mr. Bray, in preparing his annual taxes, mentioned Leverage to his accountant, who expressed skepticism regarding Barry's assertions that no taxes were owed on Leverage's earnings. *Id*. at ¶ 29. Mr. Bray emailed Barry, requesting clarification of this process. *Id*. That same day, Barry emailed Mr. Bray stating that the options transactions in which the fund dealt were considered contracts and not capital assets, and that the ownership of the options income actually belonged to Leverage, which issued payments on the income to investors in the form of distributions. *Id*. at ¶ 30. Until such a distribution was issued, taxation would be deferred. *Id*. On February 6, 2008, Barry sent Mr. Bray an email stating that Leverage was secured against market fluctuations because it kept a variable form of its assets "in the form of precious metals." *Id*. at ¶ 31.

In Mid-February, 2008, plaintiffs decided to test their ability to withdraw money from Leverage before investing more into it. Mr. and Mrs. Bray requested that defendants return $200,000 from their accounts with Leverage by wire transfer. *Id*. at ¶ 32. Two weeks after this request, defendants wired plaintiffs a payment of $16,520.06, which Barry characterized as "interest." *Id*. at ¶ 33. Barry stated that the rest of the money

was "close." *Id*. A week later, Barry claimed that there had been a "mix-up" at his brokerage resulting in a delay of the funds. *Id*. at ¶ 34. Prior to this point, Barry had never informed Mr. and Mrs. Bray that he was not a broker himself. *Id*. Over the next two months, Barry continued to make excuses as to why plaintiffs' money had not been returned to them. *Id*. at ¶ 35. During this time, plaintiffs requested that defendants return an additional $100,000 held by Leverage. *Id*.

On March 31, 2008, Mr. and Mrs. Bray received the following "Quarterly Statements" from defendants: (1) for account number 4-291-07 showing an effective annual yield of 12.55% and a closing balance of $127,498.03, *id*. at ¶ 36; (2) for account number 4-292-07 showing an effective annual yield of 12.55% and a closing balance of $201,967.75, *id*. at ¶ 37; (3) for account number 9-211-07 showing an effective annual yield of 12.55% and a closing balance of $107,150.90, *id*. at ¶ 38; and (4) for account number 11-101-07, showing an effective annual yield of 12.55% and a closing balance of $104,714.95. *Id*. at ¶ 39. On April 18, 2008, Mr. Bray requested that Barry send him a partial payment of $25,000 or $50,000 by the next Monday, April 21, 2008. *Id*. at ¶ 40. On May 10, 2008, plaintiffs received $10,000 from Barry via wire transfer. *Id*. at ¶ 41. To date, no funds other than the $16,520.06 and the $10,000 have been returned to plaintiffs. *Id*. at ¶ 42.

*Greenberger Complaint*

In October 2001, plaintiff was referred to Barry to invest her money with him and his companies, the Leverage Group, Leverage Option Management, North American Financial, and Philip Barry LLC (collectively, "Leverage"). Complaint at ¶ 11 ("Compl.") Barry solicited individuals to make investments in Leverage beginning at least as early as 2001, and likely for years before then. *Id.* at ¶ 12. Since that time Barry has conducted a continuous, unregistered offering of interests in Leverage. *Id.* Barry has stated to plaintiff and other investors that Leverage engaged in the business of trading in options in publicly-traded securities, which enabled Leverage to make a profit regardless of whether the underlying security increased or decreased in value. *Id.* at ¶ 13. The Leverage companies are owned by Barry. *Id.* at ¶ 14.

The following statements were made multiple times in writing and on the telephone to plaintiff, *id*. at ¶ 16: (a) that the firm had one of the most profitable and reliable performance records in the investment management business; (b) that Leverage had consistently earned annual returns of at least 12.55% for investors; (c) that investment in Leverage would be the absolute safest place for an investor's money to grow; (d) that investments in leverage would earn a guaranteed minimum annual return of 12.55% for the subsequent year; (e) that an investor's

principal could not decrease; (f) that funds invested in Leverage would remain in a separate account for each investor; and (g) that investors would be able to liquidate their accounts upon request. *Id.* at ¶ 15.

In reliance upon defendants' statements, beginning in October 2001, plaintiff made out a series of checks to Leverage Option Management, pursuant to Barry's instructions, for defendants to invest. *Id.* at ¶ 19. Plaintiff subsequently received annual letters, each of which stated that the minimum guaranteed yield for the subsequent year would be 12.55%. Plaintiff received Quarterly Statements reflecting that her investment was earning the guaranteed 12.55% effective annual yield and her investment was growing accordingly, as investment gains were reinvested in her account. *Id.* at ¶ 21. Plaintiff received the last such Quarterly Statement on June 30, 2008. *Id.* That statement indicated that her balance at that time was $304,136.52. *Id.* Barry repeatedly informed plaintiff that she could liquidate her account, including, most recently, in August of 2008. *Id.* at ¶ 16.

In February 2008, a Leverage investor filed suit against the same defendants as are parties in this case. *Id.* at ¶ 22. A consent judgment was filed in July 2008, and that case is now closed. *Id.* On May 14, 2008, an additional group of Leverage investors filed suit against the same defendants herein. Each

suit raised similar claims to those raised by plaintiff herein and are currently pending before this court. *Id.* Despite these multiple pending lawsuits, and despite defendants' entry into a consent judgment, Barry failed to disclose the existence of these lawsuits to plaintiff in any of the numerous conversations taking place between them from February to September of 2008. *Id.* at ¶ 24.

During numerous conversations between February and September 2008, in response to plaintiff's questioning about the status of defendants' business and plaintiff's investments, Barry made affirmative representations to plaintiff that the Leverage Group was operating as normal and that plaintiff's investments were safe and growing at 12.55% annually. *Id.* at ¶ 25. These statements had the effect of discouraging plaintiff from learning of her potential legal claims and pursuing legal action. *Id.* Plaintiff did not learn of the pending lawsuits against defendants or the fact that defendants faced any difficulty meeting their obligations to investors until late September, 2008. *Id.* at ¶ 27.

In late August 2008, plaintiff telephoned Barry in order to close her account. *Id.* at ¶ 28. Barry sought to discourage her from closing her accounts, stating to plaintiff that this would amount to questioning his integrity. *Id*. Plaintiff insisted that her account be closed. *Id*. On August 24, 2008, Barry told

plaintiff that he needed 30 days to sell the options in order to liquidate her account. *Id.* at ¶ 29. He promised to return the amount listed on plaintiff's June 30, 2008 statement, along with additional accumulated interest at 12.55%, by late September 2008. *Id.* In late September 2008, Barry told plaintiff that defendants owed her $313,886.50 as of October 6, 2008. *Id.* at ¶ 30. Defendants have not returned plaintiff's account balance as Barry had promised. *Id.* at ¶ 31. Plaintiff has not yet received her September 30, 2008 Quarterly Statement. *Id.* at ¶ 32.

## Discussion

Plaintiffs request an order of attachment, pursuant to Rule 64 of the Federal Rules of Civil Procedure and N.Y. C.P.L.R. § 6201 ("§ 6201"), directing levy upon the identified real and personal property within defendants' ownership, possession, custody, or control. Under Rule 64, attachment is available in the manner provided by the law of the state in which the district court is held. *See* Fed.R.Civ.P. 64. New York law requires that plaintiffs seeking attachment must show by affidavit (1) that there is a cause of action, (2) that there is a probability of success on the merits, (3) that a ground for attachment listed in § 6201 exists, and (4) that the amount demanded from defendants exceeds all counterclaims known to plaintiffs. *See* N.Y. C.P.L.R. § 6212(a) ("§ 6212(a)").

Plaintiffs have presented sufficient evidence that they

deposited investment funds with defendants that have not been
returned upon request as required by contract and that are
currently unaccounted for. Plaintiffs have also presented
evidence that defendants have engaged in misrepresentation
regarding the nature of the investment and the status of the
investment monies when inquiries were made. Plaintiffs have
fulfilled the first requirement of § 6212(a). Plaintiffs have
also satisfied the fourth requirement that the amount demanded
from the defendant exceeds all counterclaims known to the
plaintiff, as defendant has not made any counter-claims against
these plaintiffs at this time.

<u>Likelihood of Success on the Merits</u>

Plaintiffs allege that defendants committed fraud. Under New
York law, a fraud claim consists of five elements: 1) a
representation of material fact; 2) that was false; 3) scienter;
4) reliance by the plaintiff; and 5) injury. *See Vermeer Owners,
Inc. v. Guterman*, 78 N.Y.2d 1114, 1116, 585 N.E.2d 377, 578
N.Y.S.2d 128 (1991). Rule 9(b) of the Federal Rules of Civil
Procedure requires that the circumstances constituting fraud or
mistake shall be stated with particularity. Fed. R. Civ. P. 9(b).
However, "[m]alice, intent, knowledge, and other conditions of
mind of a person's mind may be alleged generally." *Id*. The rule
is "intended to ensure that each defendant is provided with
reasonable detail concerning the nature of his particular

involvement in the alleged fraud." *The Equitable Life Assurance Society v. Alexander Grant & Co.*, 627 F.Supp. 1023, 1028 (S.D.N.Y. 1985). Fraud allegations in a complaint therefore must: "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994). Although the scienter requirement need not be plead with particularity, "[i]n order to avoid abuse... plaintiffs are required to allege facts that give rise to a strong inference of fraudulent intent." *Campaniello Imports, Ltd. v. Saporiti Italia S.P.A.*, 117 F.3d 655, 663 (2d Cir. 1997)(internal quotation marks and citations omitted). The requisite "strong inference" of fraud may be established either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness. *Shields*, 25 F.3d at 1128.

Plaintiffs have satisfied the pleading requirements for fraud and have shown a likelihood of success on the merits. Plaintiffs have made a showing that defendants misrepresented the nature and conditions of the investment, that they knew their statements were false, and that plaintiffs relied on these statements to their detriment. Plaintiffs have offered detailed

information regarding conversations containing
misrepresentations, including dates and means of communication.
*Inter alia*, they have stated that defendants repeatedly claimed
that the investments were safe and that plaintiffs would be able
to withdraw their principal at any time, both of which statements
were knowingly false. I find that plaintiffs are likely to
succeed on their fraud claim.[1]

Grounds for Attachment

   To establish the relevant grounds for attachment, plaintiffs
(a) must be seeking a money judgment, and (b) must show that
defendants, "with intent to defraud creditors or frustrate
enforcement of a judgment that might be rendered in plaintiffs'
favor, [have] assigned, disposed of, encumbered or secreted
property, or removed it from the state or [are] about to do any
of these acts." § 6201(3). The complaint seeks a money judgment,
thereby satisfying the first requirement.

   Based on plaintiff's uncontroverted allegations and on my
prior ruling, I find that defendants have assigned, disposed of,
encumbered or secreted property. Money belonging to plaintiff is
unaccounted for even after repeated requests by plaintiff.
Furthermore, as found in my prior ruling, defendants used
Leverage Group investor money to buy the building in Kings County

---

[1]Because I find that plaintiffs are likely to succeed on the merits on
this claim, I need not consider the other claims.

that is the defendants' place of business, and in all likelihood, plaintiffs' money was used to purchase or maintain some of the properties that are being sought to be attached. Bank statements also show that Barry used the accounts into which he directed the investors to deposit funds to make payments on various mortgages and also of his personal living statements. Furthermore, Barry has made several unexplained transfers of real property to Philip Barry LLC. Defendants have thus dissipated investor funds and thereby disposed of property within the meaning of § 6201(3). Defendants do not dispute this evidence of past disposal.

I also find that there is strong evidence of an intent to defraud. Defendants induced plaintiffs to give defendants money with false promises. When plaintiffs became suspicious and sought return of their money, defendants refused. Defendants offered changing stories for why the money could not be delivered. Defendants have refused to identify the money and how it was invested. These facts support a finding of intent to defraud.

Reverse veil piercing

Properties subject to the attachment include those attributable to Barry's privately held entities, Philip Barry, LLC and Leverage Management, LLC, which have no business purpose or holdings other than the real property Plaintiffs seek to attach. Plaintiffs can attach the real estate owned by these companies because plaintiffs have made a showing sufficient to

disregard the corporate form, and it is therefore appropriate to attach properties held by corporate defendants in this case.

## Conclusion

For the reasons set forth herein, plaintiffs' emergency motion to attach certain assets belonging to the defendants is granted. The Clerk is directed to transmit a copy of the within to all parties and the assigned Magistrate Judge.

SO ORDERED.

Dated :  Brooklyn, New York
         November 4, 2008


                    By: /s/ Charles P. Sifton (electronically signed)
                        United States District Judge